**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Ramsey Kettle, | No. 24-cv-4406 (KMM/LIB) |
| Plaintiff, | |
| v. | **ORDER** |
| Otter Tail County; Barry J. Fitzgibbons, *Sheriff*; Beth Carlson; Brent Floden; Greg Anderson; Ashley Larson; Michelle Boeckers; Sheyenne Evavold-Toso; Alexander Hastings; Tanner Johnson; Kyle Lehmann; Mark Olson; Jara Parker; Kenneth Rasmusson; and Kaleb Rotering; | |
| Defendants. | |

Plaintiff Ramsey Kettle brings this suit pursuant to 42 U.S.C. § 1983 alleging that Defendants violated his constitutional rights by placing him in disciplinary segregation at the Otter Tail County Jail and punishing him with deprivation of food, water, and a clean, sanitary cell for two days in early February 2024. Compl., Dkt. 1. Defendants move to dismiss Mr. Kettle's Complaint for failure to state a claim. County Defs.' Mot., Dkt. 37; Employee Defs.' Mot., Dkt. 42.[1] As explained below, Defendants' motions are granted in part and denied in part.

---

[1] In this Order, "County Defendants" refers to Otter Tail County, Otter Tail County Sheriff Barry J. Fitzgibbons, Otter Tail County Jail Administrator Beth Carlson, and Otter Tail County Assistant Jail Administrator Brent Floden. "Employee Defendants" refers to the following correctional officers employed at the Jail by Otter Tail County: Sergeant Greg Anderson, Sergeant Ashley Larson, Michelle Boeckers, Sheyenne Evavold-Toso, Alexander Hastings, Tanner Johnson, Kyle Lehmann, Mark Olson, Jara Parker, Kenneth Rasmusson, and Kaleb Rotering.

# BACKGROUND

## I. Complaint[2]

### A. Facts

Ramsey Kettle is a thirty-three-year-old citizen of the White Earth Nation and a lifelong resident of Otter Tail County. Compl. ¶ 29. Unfortunately, Mr. Kettle has been diagnosed with serious mental illnesses. Compl. ¶ 30. On several occasions, Mr. Kettle has found himself in the custody of the Otter Tail County Jail ("the Jail"), and the Defendants are familiar with him and with his mental-health conditions. Compl. ¶¶ 31–32.

Prior to the incidents that led to this case, Mr. Kettle spent time in the Jail as a pretrial detainee on charges that he made terroristic threats. On March 25, 2022, Mr. Kettle was convicted of that offense and sentenced to a term of imprisonment, which he served at the Minnesota Department of Corrections ("DOC") prison in Rush City, Minnesota ("MCF Rush City"). Compl. ¶¶ 33–34. During his time as a pretrial detainee on the terroristic-threats case, officials at the Jail determined that Mr. Kettle violated the institution's rules and imposed a disciplinary sanction of sixty days in segregation. Compl. ¶¶ 44–45. Before the full sixty-day sanction expired, however, Mr. Kettle was transferred to MCF Rush City to serve his prison sentence. Compl. ¶ 44–45. Therefore, when he left the Jail for MCF Rush City, the Jail treated the unserved portion of his disciplinary sanction as "outstanding disciplinary time." Compl. ¶ 44.

---

[2] The facts set forth in this background discussion are drawn from Mr. Kettle's complaint, and because the matter is before the Court on Defendants' motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), Mr. Kettle's factual allegations are taken as true.

On February 9, 2024, Mr. Kettle's prison sentence was set to expire, and he was scheduled to be released from MCF Rush City. Compl. ¶ 36. But before he was released, he was charged with four counts of aggravated witness tampering and transferred back to the Jail as a pretrial detainee on these new charges. Compl. ¶ 36. On April 24, 2024, the new charges were dismissed by a Minnesota state court and Kettle was released from detention. Compl. ¶ 37. But prior to his release, Mr. Kettle claims that his constitutional rights were violated in several ways.

### *Punitive Rollover Segregation*

Because Mr. Kettle had "outstanding disciplinary time" upon his return to the Jail in February 2024, he was placed directly into segregated confinement—a practice referred to by the parties as "rollover discipline." Compl. ¶ 44. Specifically, he was placed in the restrictive housing unit (Cellblock A) in a segregation cell (Cell A-101) to complete the balance of his rollover disciplinary time. Compl. ¶ 46. This placement followed official Jail policy, endorsed by Defendant Otter Tail County Sheriff Barry Fitzgibbons. Compl. ¶ 46.

Prior to being placed in Cellblock A, Mr. Kettle did not receive a mental-health evaluation by a qualified mental-health professional. Compl. ¶ 47. He was only briefly assessed upon arrival by Defendant Correctional Officer Tanner Johnson, and Jail officials conducted no assessment of how segregation would impact Kettle's mental health. Compl. ¶¶ 48–49. Mr. Kettle received no opportunity to contest his placement in segregation pursuant to the Jail's rollover discipline policy. Compl. ¶ 50.

*Feb. 10, 2024 – Feb. 12, 2024*

Mr. Kettle arrived at the Jail on Friday, February 9, 2024. At 6:53 a.m. the following morning—Saturday, February 10, 2024—the Employee Defendants gave Mr. Kettle a tray with a single serving of juice and an individual carton of milk. However, they provided him no food. Compl. ¶ 53. Later that morning, Mr. Kettle asked for the legal paperwork he had brought with him from MCF Rush City to the Jail. Compl. ¶ 54. In response to this request, the Employee Defendants gave him materials belonging to another person. Compl. ¶ 55. Mr. Kettle was concerned that his own paperwork, which contained sensitive, personal information, may have mistakenly been given to another detainee. Compl. ¶ 55. He asked for the error to be corrected, but the Employee Defendants ignored his requests. Compl. ¶ 56.

Aggrieved by the lack of a response, Mr. Kettle wanted to get the Employee Defendants' attention. At 10:27 a.m. on Saturday, February 10, 2024, he smeared his feces on the door of his cell, including on the door's window. Compl. ¶ 57. This obscured the view into the cell. Compl. ¶ 58. Approximately 20 minutes later, Mr. Kettle threw his feces under the door of his cell, out into a common area. Compl. ¶ 59. The Employee Defendants did not return his paperwork to him at that time. Instead, they denied him access to food, water, any opportunity to take a shower, to exercise, and any medical or mental-health attention for the next 52 hours. Compl. ¶¶ 60–61. Mr. Kettle alleges that over the course of the next two days, the Employee Defendants demanded that he clean up his cell before he would be allowed to eat, drink, shower, or exercise, and when he refused, they retaliated by withholding these basic human needs from him.

Each of the Employee Defendants took shifts as corrections officers at the Jail over the weekend of February 10th and 11th. Compl. ¶¶ 51–52. They worked in twelve-hour shifts—the day shift lasted from 6:00 a.m. until 6:00 p.m., and the night shift lasted and from 6:00 p.m. until 6:00 a.m. the following morning. Compl. ¶ 51. During the morning of the February 10th day shift, the Employee Defendants turned off the water to Mr. Kettle's cell shortly after he smeared feces inside the cell and on the vision panel. Compl. ¶ 63. This deprived Mr. Kettle of the ability to access water to drink, clean himself, clean his cell, or flush the toilet. Compl. ¶ 63.

The Jail's policies require that corrections officers conduct routine well-being checks on the Jail's detainees. One such well-being check took place, according to an Inmate Log Report, on February 10th at 10:44 a.m. Although there were feces contaminating his cell and obstructing the vision panel, Officer Rotering did not note those conditions and reported solely that Mr. Kettle was "OK." Compl. ¶64. Another log shows a well-being check by Sergeant Anderson at 11:12 a.m. on February 10th, which also indicates that Mr. Kettle was "OK" and makes no mention of the feces contaminating his cell. Compl. ¶ 65. Shortly thereafter, Defendants documented that they would not give him food and water until he cleaned his cell. Compl. ¶ 66. Further log reports from the day shift on February 10th continue to indicate Mr. Kettle was "OK" and that the Employee Defendants withheld food from him. These notes from purported well-being checks also omit discussion of the waste covering his cell other than to indicate that he was told he needed to clean it before he would receive food. Compl. ¶¶ 67–70.

5

In "Pass On Logs," noting the transition from the day shift to the night shift on February 10th, the Employee Defendants wrote that "[a]fter a quiet, non eventful start to our morning, Kettle decided to paint his cell, door and window with his feces. He has been told that he needs to clean it up but he refuses. The vapo rub is in the middle drawer of the LU desk." Compl. ¶ 71. The reference to "vapo rub" is to a substance that could be used to mask the smell emanating from Mr. Kettle's cell. Compl. ¶ 71. Because of the smell, Jail officials had to relocate detainees from a unit adjacent to Mr. Kettle's cell. Compl. ¶¶ 72–73. At least one person in the adjacent unit became physically ill because of the stench. However, Mr. Kettle was left where he was, and the Employee Defendants continued to demand that Kettle clean his cell. Compl. ¶ 74. When they approached Mr. Kettle's cell, they wore masks to shield themselves from the odor. Compl. ¶ 75.

At 6:00 p.m. on February 10th, Corrections Officers Boeckers, Hastings, Johnson, Parker, Rasmussen, and Sergeant Larson began their shifts. Compl. ¶ 77. These Employee Defendants did not provide Mr. Kettle with food, water, or medical assistance. They did not restore water service to his cell, nor did they address the presence of feces in his cell or in the common area outside. Compl. ¶ 78. At or around 6:31 p.m. on February 10th, one or more of the Employee Defendants observed Mr. Kettle consuming his own feces by licking the vision panel. Compl. ¶ 79. Later that night, at 10:45 p.m., the Employee Defendants stated in log reports that Kettle "spent the first few hours of the [night] shift yelling and banging on the door." Compl. ¶ 80.

Mr. Kettle repeatedly requested water, food, a shower, and an hour of exercise over the course of February 10th and into the morning of February 11th. Compl. ¶ 81. However,

the Employee Defendants ignored his requests. Compl. ¶ 81. Log Reports indicate that the Employee Defendants conducted 28 well-being checks on Mr. Kettle during the February 10th night shift, and each of the defendants working that evening conducted at least one of those well-being checks. Compl. ¶ 82. The records of the night-shift well-being checks indicate only that Mr. Kettle was "OK" and do not mention the condition of his cell. Compl. ¶ 82.

At 6:00 a.m. on February 11th, the day shift began, staffed by the same officers who worked the previous day: Officers Evavold-Tosso, Lehmann, Rotering, Olson, and Sergeant Anderson. Compl. ¶ 83. Throughout the day, the Employee Defendants continued to withhold food, water, and access to exercise, a shower, and medical attention from Mr. Kettle. Compl. ¶ 84. The day shift records indicate that Mr. Kettle would receive a bottle of water at tray pass at 4:20 p.m., but a DOC investigation of the Jail later confirmed that no bottle of water was provided to Mr. Kettle at that time. Compl. ¶ 85; Compl., Ex. A (DOC Conditional License Order at 3).

At some point during the February 11th day shift, Mr. Kettle became so thirsty that he attempted to drink water from his toilet. Compl. ¶ 86. However, the toilet contained urine and feces, and he could not flush it because the water to his cell had been shut off since approximately 10:30 a.m. on February 10th. Compl. ¶ 86. At one point, Mr. Kettle asked Officer Evavold-Tosso for water, saying that he needed water to survive. To that, Officer Evavold-Tosso allegedly responded "I wonder why that is," and refused his request. Compl. ¶ 87. Employee Defendants conducted twenty-nine well-being checks over the course of the February 11th day shift, and each of the Employee Defendants

working that shift made at least one of those checks. Compl. ¶ 88. The Employee Defendants continued to note merely that Mr. Kettle was "OK" and made no mention of the conditions of his cell. Compl. ¶ 88.

At 6:00 p.m. on February 11th, the night shift crew—Officers Boeckers, Hastings, Johnson, Parker, Rasmussen, and Sergeant Larson—returned to work until 6:00 a.m. on Monday, February 12th. Compl. ¶ 89. At 6:31 p.m., the Employee Defendants observed Mr. Kettle "licking the feces off the cell window," but they did not respond to his statements that he was "hungry so I'm eating my own shit." Compl. ¶ 91; Compl., Ex. A, DOC Conditional License Order at 3.[3] The Employee Defendants did not change their behavior based on this clear sign of distress and did not provide Mr. Kettle with a shower to rid himself of the contamination. Compl. ¶ 92. Defendants did not contact the on-call medical provider or update "the health authority of potential medical or mental health crisis." Compl. ¶ 93.

Mr. Kettle was not provided with any food or beverage by Jail staff until the morning of Monday, February 12th. At 6:00 a.m. on that dday, the Employee Defendants were shift-changed out for a group of weekday corrections officers who had not worked over the weekend. Compl. ¶ 102. Mr. Kettle told one of these officers that he hadn't eaten for two

---

[3] The DOC's Conditional License Order indicates that this incident occurred at 6:31 p.m. on February 11th, which is consistent with the allegations in Paragraph 91 of the Complaint. The Complaint also alleges that Mr. Kettle was observed consuming his own feces at 6:31 p.m. on February 10th. Compl. ¶ 79. Thus, Plaintiff alleges that one or more of the Employee Defendants saw him eating his own feces twice: first, at or around 6:31 p.m. on February 10th; and again, at or around 6:31 p.m. on February 11th. Compl. ¶ 93 (indicating that Defendants "saw Mr. Kettle eat his feces a second time since they started their punishment of him"). At oral argument on the motions to dismiss, Mr. Kettle's counsel confirmed that it was his understanding that this occurred twice around the same time on both days.

days, was dehydrated, and had a severe headache. Compl. ¶ 103. At 6:54 a.m., more than sixty hours since Mr. Kettle had been provided solid food, a weekday officer gave him milk and juice. Compl. ¶ 104. About two hours later, the weekday officers allowed Mr. Kettle to shower and clean himself, and around 9:30 a.m. he was allowed to eat solid food and drink water. Compl. ¶¶ 105–06. After eating solid food, Mr. Kettle became sick and threw up, but he was given access to medical professionals. Compl. ¶ 107.

### *DOC Investigation and Aftermath*

Mr. Kettle alleges that Sheriff Fitzgibbons and Jail Administrator Carlson knew about the mistreatment he experienced when it occurred or shortly thereafter. Compl. ¶ 111. He also asserts that Assistant Jail Administrator Floden[4] not only knew of the mistreatment but, in fact, directed the Employee Defendants to withhold meals and exercise and to leave Mr. Kettle in his contaminated cell as a punishment. Compl. ¶ 112. Sheriff Fitzgibbons, Administrator Carlson, and Assistant Administrator Floden allegedly "failed to adequately record the condition of his cell before it was … cleaned by weekday officers," which hid the fact that one could not see through the soiled vision panel into his cell. Compl. ¶ 113.

Administrator Carlson did not report the Employee Defendants' actions to the DOC's Inspection and Enforcement Unit ("I&E") until February 20, 2024, more than a week later. Compl. ¶ 114. When she made that report, she falsely represented that Mr. Kettle only missed three meals over the weekend, when knew that Mr. Kettle missed six

---

[4] The Complaint refers to Brent Floden as the Assistant Jail Administrator, Compl. ¶ 16, and as the Acting Jail Administrator, Compl. ¶ 112.

meals. Compl. ¶¶ 115–16. Administrator Carlson also left out details about Mr. Kettle receiving no water, languishing in a feces-contaminated cell, showing signs of mental and physical distress, and the Employee Defendants' refusal to relent and to obtain medical or mental health care for him. Compl. ¶ 116. She also advised I&E that she had launched an internal investigation and hired an outside law firm, which had the effect of delaying the eventual I&E investigation. Compl. ¶¶ 117–18.

On February 28, 2024, one of the corrections officers at the Jail filed a whistleblower complaint with the State of Minnesota's Ombudsman for the DOC expressing concern over Mr. Kettle's treatment and the lack of follow up from the Jail administrators. Compl. ¶¶ 119–20. I&E initiated an investigation in response to the whistleblower complaint, interviewed Mr. Kettle, and reviewed video from the Jail. Compl. ¶¶ 121–24. Eventually the Inspector General of the I&E issued a Conditional License Order for the Jail, essentially limiting the degree to which the Jail could function as a place to house pretrial detainees and others. Compl. ¶ 125; Conditional License Order. In addition to relaying the events of the weekend of February 10–12, 2024, the Conditional License Order found that the Employee Defendants' conduct stemmed from a lack of adequate training, did not comply with the standards established by Minnesota's administrative rules, and created conditions that presented a risk of serious harm to Jail occupants. The Conditional License Order also imposed training requirements on the Jail and reduced the category of its license to operate as a correctional facility. Compl. ¶¶ 126–133.

Mr. Kettle alleges that this is not the first time that the Jail has had issues with the way its corrections officers conducted well-being checks. He points out that in 2021,

another Native American detainee at the jail, Lavuya Jade Baker, was found dead in her cell. Compl. ¶ 135. Mr. Kettle asserts that the facts of Ms. Baker's case are similar to his own in that the routine well-being checks that took place did not conform to the most basic requirements. He also alleges that a subsequent DOC investigation indicated that well-being checks in Ms. Baker's case either were not performed at all, or were performed too hastily to recognize whether or not a detainee was, in fact, in good health. Compl. ¶¶ 136–39. The DOC also found that the Jail's mental health screening procedures were insufficient and those with mental health needs required more frequent observation than the Jail was providing. Compl. ¶¶ 142, 144. The DOC imposed a corrective action plan and required the Jail to audit well-being checks to determine whether staff were following the requirements of state law. Compl. ¶¶ 140–41. Mr. Kettle ultimately asserts that although the Jail has an official policy on well-being checks, Sheriff Fitzgibbons, Administrator Carlson, and Assistant Administrator Floden knew that the actual pattern and practice at the Jail has been to ignore these requirements for years, and the Jail's officers conduct only perfunctory well-being checks and fail to adequately supervise those in custody. Compl. ¶ 145.

### B. Claims

Mr. Kettle's claims are divided into eight Counts in the Complaint. Start with the five federal claims. In Count I, pursuant to 42 U.S.C. § 1983, Kettle alleges that all Defendants violated his due process rights under the Fourteenth Amendment through his placement in segregated confinement based on rollover disciplinary time. Compl. ¶¶ 159–73. Count II also asserts a due process claim against all Defendants based on their alleged

punitive denial of food, hydration, medical care, exercise, and access to a shower, as well as their actions prolonging Kettle's exposure to biohazard material. Compl. ¶¶ 174–205. In Count IV, Mr. Kettle asserts that the County, Sheriff Fitzgibbons, and Jail Administrators Carlson and Floden are liable under § 1983 for: a pattern or practice of failing to meet minimum constitutional standards in performing wellness checks; and failing to train officers on policies and minimum constitutional requirements regarding detainee welfare and being deliberately indifferent to the harm caused by that failure to train. Compl. ¶¶ 211–17. The last two federal claims assert that the County Defendants violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1210 (Count V), and Rehabilitation Act ("RA"), 29 U.S.C. § 701 (Count VI), by failing to provide reasonable accommodations for Mr. Kettle's mental illnesses and discriminating against him because of those mental-health conditions. *Id.* ¶¶ 218–32.

Mr. Kettle's remaining three claims arise under Minnesota state law. In Count III, Kettle alleges that all Defendants are liable for violating his due process rights under Article I, § 7 of the Minnesota State Constitution. Compl. ¶¶ 206–10. Counts VII and VIII are common-law tort claims. Mr. Kettle claims that all Defendants are liable for negligence because they failed to exercise reasonable care when they placed him in segregated confinement and then allowed him to remain there without a mental health assessment, or reasonable access to food, water, and sanitary conditions. Compl. ¶¶ 233–37. And he claims that all Defendants are liable for intentional infliction of emotional distress for the same conduct. Compl. ¶¶ 238–43.

Mr. Kettle seeks compensatory as well as punitive or other exemplary damages. Compl., Prayer for Relief ¶¶ A, C. He also seeks to recover attorney's fees and costs pursuant to 42 U.S.C. § 1988. Compl., Prayer for Relief ¶ D. Finally, he requests that Defendants be permanently enjoined from interfering with his constitutional rights, including prohibiting them from retaliating against him for bringing the lawsuit, and subjecting him to unlawful punishment. Compl., Prayer for Relief ¶ B.

## DISCUSSION

## I.    Legal Standards

### A. Failure to State a Claim

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

**B.  Section 1983 Liability and Qualified Immunity**

In 42 U.S.C. § 1983, Congress created a cause of action against state officials who deprive others of federal constitutional or statutory rights when acting under color of state law. 42 U.S.C. § 1983. "[T]o state a claim for relief under § 1983, a plaintiff must allege sufficient facts to show (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010) (cleaned up). "[T]he plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014).

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Faulk v. City of St. Louis, Mo.*, 30 F.4th 739, 744 (8th Cir. 2022) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is an immunity from suit, not an immunity from liability. *Id.* To overcome qualified immunity at the motion-to-dismiss stage, the plaintiff must plead facts "showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "A right is clearly established when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023) (internal quotations omitted). What constitutes clearly established law is not defined at a "high level of generality," and, instead, requires "a controlling case or a robust consensus

14

of cases of persuasive authority." *Thurmond v. Andrews*, 972 F.3d 1007, 1012 (8th Cir. 2020) (internal quotations and citations omitted).

### C. *Monell* **and** *City of Canton*

"In general, 'a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents' on a respondeat superior theory of liability." *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (quoting *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). However, the Supreme Court has held that a local government can be considered a "person" for purposes of § 1983 liability under certain circumstances. *Monell*, 436 U.S. at 691. "A [local government] can be liable under § 1983 if an 'action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Watkins v. City of St. Louis*, 102 F.4th 947 (8th Cir. 2024) (quoting *Bernini v. City of St. Paul*, 665 F.3d 997, 1007 (8th Cir. 2012) (quoting *Monell*, 436 U.S. at 691)). To state a claim against a local government under § 1983, the plaintiff must allege that the constitutional or statutory violation was caused by either (1) an official policy; (2) an unofficial custom; or (3) deliberate indifference to a failure to train or supervise. *Id.* (citing *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 1999)).

For purposes of *Monell* liability, the terms "policy" and "custom" are not "interchangeabl[e]." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the [local government] official who has final authority regarding such matters." *Id.* (citing *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998)). A city or county custom, on the other hand, requires the plaintiff to show: (1) a continuing, widespread, persistent

15

pattern of unconstitutional conduct by the municipality's employees; (2) policymaking officials' deliberate indifference to or authorization of that conduct after notice; and (3) that the custom was the moving force behind the plaintiff's injury. *Id.* To survive a motion to dismiss, a plaintiff is "not required to specifically plead the existence of an unconstitutional policy or custom. . . ." *Watkins*, 102 F.4th at 953–54. However, the plaintiff "must allege facts which would support the existence of an unconstitutional policy or custom," and a complaint should only be dismissed where it contains no "allegations, reference, or language by which one could begin to draw an inference that the conduct complained of resulted from an unconstitutional policy or custom." *Id.* (quoting *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003)) (cleaned up).

"[A] local government may [also] be subject to § 1983 liability for 'inadequate training of its employees[.]" *Parrish*, 594 F.3d at 997 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Under *City of Canton*, a county may be liable for failure to train when (1) its training was inadequate; (2) it adopted training practices with deliberate indifference to the rights of others; and (3) its inadequate training caused the plaintiff's injury. *Id.* (citing *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996)). To adequately allege a failure-to-train claim, the plaintiff must show that the county "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Id.* (quoting *Andrews*, 93 F.3d at 1076).

## II.    Count I – Rollover Disciplinary Segregation

In Count I, Mr. Kettle asserts substantive and procedural due process claims against all Defendants based on his placement in rollover disciplinary segregation when he was

returned to the Jail on February 9, 2024. Defendants move to dismiss this claim under Rule 12(b)(6). The Court finds that Defendants are entitled to qualified immunity on Plaintiff's individual-capacity claims. However, the Court finds that Mr. Kettle has stated a plausible claim against Otter Tail County.

"Prisoners' and pretrial detainees' constitutional claims are analyzed under different standards." *Ballinger v. Cedar Cnty., Mo.*, 810 F.3d 557, 560 (8th Cir. 2016) (quoting *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010)). For pretrial detainees, "[t]he proper inquiry is whether th[e] conditions [of confinement] amount to punishment" because "under the Due Process clause, a detainee may not be punished prior to an adjudication of guilt." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). But not every restriction "imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Id.* (quoting *Bell*, 441 U.S. at 537). "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* When deciding whether a pretrial detainee has been placed in seclusion as a form of punishment, courts engage in the same inquiry—asking whether the detention is reasonably related to a legitimate government interest or whether the conditions amount to punishment. *See Hall v. Ramsey Cnty.*, 801 F.3d 912, 919 (8th Cir. 2015) (citing *Smith*, 87 F.3d at 268).

It is sufficient to state a claim for a violation of due process for a pretrial detainee to allege that he was placed in disciplinary segregation without first receiving written notice of the disciplinary infractions charged, a chance to prepare a response, a written statement of the evidence relied on by the officials seeking to impose the discipline, and an impartial

hearing with a chance to call witnesses and present evidence. *See Hartsfield v. Nichols*, 511 F.3d 826, 830 (8th Cir. 2008) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974)); *Kruel v. Doe*, No. 5:24-cv-05016-TLB-CDC, 2024 WL 4601055, at *4 (W.D. Ark. Oct. 8, 2024) (finding that plaintiff stated a plausible violation of due process where he alleged "he was accused of wrongdoing by [a defendant] and then moved to the hole without a disciplinary [hearing procedure] being issued" and citing *Hartsfield*, 511 F.3d at 830), *report and recommendation adopted by,* 2024 WL 4597213 (W.D. Ark. Oct. 28, 2024). However, where a pretrial detainee receives these procedural protections prior to imposition of a disciplinary sanction, there is no constitutional violation. *See Whitfield v. Dicker*, 41 F. App'x 6, 7 (8th Cir. 2002) (per curiam) ("As to the disciplinary segregation, the record shows that in each disciplinary proceeding, Whitfield received advance notice of the claimed violations and a written statement by the disciplinary committee of its findings, and was afforded the right to call witnesses.").

### A. Qualified Immunity

Defendants argue that they are entitled to qualified immunity on Count I of the Complaint. They contend that there is no controlling authority or a robust consensus of case law that would place the constitutionality of such a practice beyond debate. The Court agrees that the individual-capacity claims asserted in Count I should be dismissed based on qualified immunity.

Mr. Kettle identifies no caselaw placing the constitutionality of the practice of imposing rollover disciplinary segregation beyond debate. Plaintiff is correct that the Eighth Circuit found the imposition of rollover disciplinary segregation to be constitutional

in the case of a convicted inmate. *Pletka v. Nix*, 957 F.2d 1480 (8th Cir. 1992).[5] And there is no controlling case similarly holding that such a practice is constitutional with respect to pretrial detainees. Plaintiff is also correct that, in general, "punishment" of pretrial detainees is not permitted. *See Karsjens v. Lourey*, 988 F.3d 1047, 1052 (8th Cir. 2021). However, a plaintiff seeking to overcome the defense of qualified immunity must point to controlling case law or robust consensus of persuasive authority placing the constitutionality of the challenged conduct beyond debate. Neither the general distinctions to be drawn between pretrial detainees and convicted prisoners, nor the prohibition on "punishment" of pretrial detainees provides the necessary clarity here. Plaintiff points to no authority establishing that on February 9, 2024 any reasonable officer would have known that imposing rollover disciplinary segregation on Mr. Kettle without a new hearing was unconstitutional.[6]

As a result, Plaintiff's individual-capacity claims in Count I against the Defendants are dismissed based on qualified immunity.

---

[5] In their briefing, while acknowledging that *Pletka* involved a inmate, as opposed to a pretrial detainee, Defendants suggest that *Pletka* supports a conclusion that the practice of imposing rollover discipline is appropriate regardless of the distinction between those two classes of individuals. County Defs.' Mem. 10–12, Dkt. 40; Employee Defs.' Mem. 5, Dkt. 45. Despite Defendants' efforts to extrapolate such a definitive rule from the Eighth Circuit's *Pletka* decision in the context of pretrial detainees, the Court is not persuaded. Indeed, as a case concerned only with the contours of due process rights of inmates, *Pletka* says nothing about the requirements of due process for pretrial detainees.

[6] In addition, the Court notes that the Complaint does not allege how any of the Employee Defendants was involved in the initial decision to place Mr. Kettle in disciplinary segregation when he returned to the Jail from MCF Rush City. Rather, the Complaint supports an inference that Mr. Kettle was placed in disciplinary segregation on February 9, 2024 based on an official Otter Tail County Jail policy. This lack of personal involvement by the Employee Defendants constitutes an independent basis to dismiss Count I against them.

### B. Otter Tail County

Unlike the individual-capacity claims, qualified immunity does not apply to Otter Tail County. *Hemmah v. City of Red Wing*, 592 F. Supp. 2d 1134, 1141 n.2 (D. Minn. 2008) (citing *Owen v. City of Independence*, 445 U.S. 622, 638 (1980); *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007)). Otter Tail County moves to dismiss Plaintiff's due process claims concerning the County's rollover discipline policy. Specifically, Mr. Kettle claims that the County violated his due process rights based on an alleged policy requiring pretrial detainees who have outstanding disciplinary time from Otter Tail County Jail to serve the remainder of the previously imposed sanction whenever they are later returned to the Jail on an unrelated offense. The Court finds that the County has failed to show that this claim fails as a matter of law, and the motion to dismiss is denied in this respect.

Start with the alleged existence of the County's policy. The Court finds Mr. Kettle has plausibly alleged that the County has an official policy. He plainly asserts that the County has established an official procedure or principle that leads to placement of pretrial detainees in rollover segregation based on outstanding disciplinary time. *See Mettler*, 165 F.3d at 1204 (describing an official local government "policy" for purposes of *Monell* liability). The County does not argue otherwise.

Nor does the County contest Mr. Kettle's claim that the Jail's rollover disciplinary segregation policy caused his placement in an isolation cell. *See id.* (requiring the alleged policy to be the "moving force" behind the plaintiff's injury). As a result, the Court finds the Complaint adequately alleges causation for purposes of the *Monell* claim in Count I.

20

The County argues only that "the practice of rolling over disciplinary segregation is not unconstitutional, so there can be no *Monell* claim based on this custom." County Defs.' Mem. 23. But the County does not point to any case law establishing such a rule. As noted above, the Eighth Circuit's decision in *Pletka* addresses a prison's use of rollover disciplinary segregation with an *inmate* who has been convicted of a crime, and says nothing about the scope of a pretrial detainee's constitutional rights. *See also Ballinger*, 810 F.3d at 560 (explaining that there are different standards for the constitutional claims of pretrial detainees and those of prisoners).

The County Defendants also rely on *Bruns v. Halford*, 913 F. Supp. 1295 (N.D. Iowa 1996) and *Ford v. Bender*, 768 F.3d 15 (1st Cir. 2014). However, *Bruns* considered the constitutionality of placing a pretrial detainee in *administrative segregation* without a hearing for legitimate penological reasons; it does not address the question of punitive disciplinary segregation that is at issue in this case. The First Circuit's decision in *Ford* is also of limited use here because it addressed only the second prong of qualified immunity analysis—whether it was clearly established that the imposition of rollover disciplinary segregation was unconstitutional—not the related question of the constitutionality of the practice itself. And the *Ford* court made its assessment on a complete record at the summary-judgment stage. *Id.* at 22–28. As such, *Ford* does not establish, as a matter of law, that imposing rollover disciplinary segregation on a pretrial detainee is consistent with due process.

Therefore, the Court finds that it cannot conclude that Mr. Kettle fails to state a due process claim against the County concerning its decision to place Mr. Kettle in isolation

on February 9, 2024. Whether the County's decision followed an "opportunity to be heard at a meaningful time and in a meaningful manner" is the essence of a procedural due process claim. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Evaluation of such a claim requires balancing the specific interest affected, the likelihood that the County's procedures would result in an erroneous deprivation, and the County's interests in providing the process that it did, including the administrative costs and burdens of providing additional process. *Id.* at 332–35. Procedural due process claims regarding pretrial detainees often turn on whether the defendant shows that there is a legitimate government interest in managing a facility when deciding whether to place a pretrial detainee in seclusion. *See Hall*, 801 F.3d at 919 (discussing *Whitfield*, 41 F. App'x at 7). These are issues of fact that cannot be resolved in favor of the County at this stage and on the present record.

The County also does not meaningfully dispute Mr. Kettle's assertion that punishment of a pretrial detainee is a violation of substantive due process. *See Bell*, 441 U.S. at 534–35 & n.16; *Karsjens*, 988 F.3d at 1052. Whether the County's rollover disciplinary segregation policy amounted to punishment of Mr. Kettle depends on whether he can show that the Defendants expressed an intent to punish him or whether there was an alternative reason for imposing the restriction on his liberty and whether that restriction is excessive in relation to that reason. *Karsjens*, 988 F.3d at 1052; *see also Smith*, 87 F.3d at 268 ("[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to

'punishment.'"). This issue too cannot be resolved in the County's favor at the motion-to-dismiss phase.

Nothing properly before the Court at this stage of the proceeding demonstrates that the County had a legitimate governmental purpose in placing Mr. Kettle in solitary confinement for events that occurred two years earlier. *See Allah v. Milling*, 982 F. Supp. 2d 172, 179–81, 183 (D. Conn. 2013) (denying defendants' motions for summary judgment on pretrial detainee's procedural and substantive due process claims concerning placement in disciplinary segregation based on outstanding disciplinary time from an earlier period of incarceration).[7] Final consideration of this claim requires a more developed factual record. Accordingly, the County's motion to dismiss Count I of the Complaint is denied.

## III.    Counts II & IV – Deprivation of Food, Water, and Shower

Defendants next argue that the Court should dismiss Count II and IV[8] of the Complaint, which alleges that Defendants violated Mr. Kettle's Fourteenth Amendment due process rights by depriving him of food, hydration, medical care, exercise, a shower, and leaving him in a cell covered in feces. In essence, Mr. Kettle alleges that he was

---

[7] In Mr. Allah's case, the district court entered judgment in his favor on both his procedural and substantive due process claims following a bench trial. *Allah v. Milling*, No. 3:11-cv-668 (WIG), 2016 WL 1311997 (D. Conn. Apr. 4, 2016). On appeal, the Second Circuit upheld the trial court's determination that Allah had prevailed on his due process claims, but reversed the judgment based on qualified immunity. *Allah v. Miiling*, 876 F.3d 48 (2d Cir. 2017); *see id.* at 57 ("Allah's placement in Administrative Segregation violated due process because the placement was not based on any concern about institutional safety, but simply on Allah's prior assignment to (and failure to complete) Administrative Segregation during a prior term of incarceration.").

[8] Whereas Count II of the Complaint is asserted against all Defendants, Count IV of the Complaint is asserted against the County Defendants under *Monell* and *City of Canton*. Like Count II, the *Monell* and *City of Canton* claims in Count IV also concern the conditions to which Mr. Kettle was subjected from February 10–12, 2024.

subjected to unconstitutional punishment during his confinement based on his treatment by Defendants from February 10th through the 12th. The Employee Defendants argue that they are entitled to qualified immunity for this claim. Employee Defs.' Mem. 5–7. As explained below, their motion to dismiss Count II is denied. The County Defendants also seek dismissal of this claim on a variety of grounds. County Defs.' Mem. 13–26. The County Defendants' motion is granted in part and denied in part.

As discussed, the Fourteenth Amendment prohibits detainees from being confined in conditions that amount to punishment. *Bell*, 441 U.S. at 535; *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 906–07 (8th Cir. 2020). The "government may detain defendants pretrial and may subject them to the restrictions and conditions of a detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Stearns*, 957 F.3d at 907 (quoting *Bell*, 441 U.S. at 536–37). There are "two ways to determine whether conditions rise to the level of punishment." *Id.* First, "[a] plaintiff could show that the conditions were intentionally punitive." *Id.* Second, pretrial conditions may constitute punishment when they are "not reasonably related to a legitimate governmental purpose or were excessive in relation to that purpose," making them "arbitrary or excessive." *Id.*; *see also Karsjens*, 988 F.3d 1047. "If conditions are found to be arbitrary or excessive, it is permissible to 'infer that the purpose of the governmental action is punishment that may not be inflicted upon detainees *qua* detainees.'" *Stearns*, 957 F.3d at 907 (quoting *Bell*, 441 U.S. at 539). In determining whether the conditions of confinement are arbitrary or excessive, courts are "concerned with the totality of circumstances of [the plaintiff's] confinement and not any particular condition in

isolation," so "piecemeal analysis of the conditions . . . miss[es] the point." *Id.* at 909 (citing *Morris*, 601 F.3d at 810).

## A. Employee Defendants

The Employee Defendants seek dismissal of Mr. Kettle's due process claim in Count II for failure to state a claim, but the Court finds that the Complaint describes a scenario in which the guards working at the Jail over the weekend of February 10th and 11th acted with the requisite intent to punish Mr. Kettle. The Complaint explains that Mr. Kettle was deprived of food and water for more than 48 hours. The Employee Defendants had the means to provide those basic human necessities to him (and to allow him to take a shower and get exercise) but refused to do so because Mr. Kettle had smeared his own excrement on his cell and thrown it under the door into the common area. The Complaint supports an inference that the Employee Defendants continued to deprive Mr. Kettle of food and water, access to a shower or the ability to exercise, and left him exposed to unsanitary conditions over the course of the weekend in retaliation for his conduct—not because doing so served any legitimate governmental purpose. The Court finds these allegations, and the Complaint as a whole, sufficient to support a plausible claim that Mr. Kettle was punished in violation of the Due Process Clause.

The Employee Defendants' arguments for dismissal are not persuasive. They acknowledge that the "denial of food cannot be used as punishment." Employee Defs.' Mem. 6 (citing *Maxwell v. Mason*, 668 F.2d 361 (8th Cir. 1991)). However, citing the Eastern District of Missouri's decision in *Bradford v. Blake*, No. 4:05-cv-136 CAS, 2006 WL 744307 (E.D. Mo. Mar. 23, 2006), they argue that Mr. Kettle's claim should be

25

dismissed because his Complaint allegedly shows his access to food and water was entirely within his control. Employee Defs.' Mem. 6–7 (citing Compl. ¶ 179). This characterization of the Complaint is inaccurate and implicitly asks the Court to take inferences from the facts alleged in favor of the Employee Defendants. In fact, a proper application of Rule 12(b)(6) to the Complaint shows that the Employee Defendants had plenty of opportunities to provide Mr. Kettle with food and water over the weekend in question, but they callously chose not to do so because they intended to punish him for having fouled his cell. Indeed, the Complaint makes clear that the Employee Defendants chose not to feed Mr. Kettle or provide him water because he had spread excrement on his cell and had not cleaned the mess.[9]

Nothing in the summary-judgment decision in *Bradford* changes this analysis. The *Bradford* court rejected the plaintiff's claim based on a complete record following discovery, and in that context the court found that Mr. Bradford "chose not to eat" after the defendants restricted him to his living unit when he refused to wear a badge that would have allowed him to move to the dining unit. 2006 WL 744307, at *5. The evidence showed that "during the time [Bradford] refused to wear his badge, evening snacks were available on every ward at [the facility] for the residents [and] Bradford *ate evening snacks during the time he was not allowed to leave the ward*" due to his refusal to wear the badge. *Id.* at

---

[9] Of course, the water to his cell had been shut off and there is no indication that the Employee Defendants offered Mr. Kettle any cleaning supplies or other means of (to partially indulge the Employee Defendants' troubling framing of the issue) *earning* his access to basic human necessities.

*2 (emphasis added). In other words, the evidence in that case showed that the defendants did not deprive Mr. Bradford of food and water; instead, he was restricted from accessing the food hall so long as he would not wear his badge. There is nothing comparable about the allegations in this case, making *Bradford* inapposite. Taking the facts in the Complaint as true and the inferences from those facts in Mr. Kettle's favor, he was suffering from mental illness, he had no access to any food or water because he was in isolation, the Employee Defendants turned off the water in his cell, and the only way that the Employee Defendants would allow him to eat or drink over the weekend was if he somehow cleaned his cell. Where Mr. Bradford simply had to put on his badge to be permitted to access the food hall, there are no facts alleged showing that Mr. Kettle even had the option of cleaning his cell given that Defendants shut off the water shortly after he made a mess of it.

Next, the Employee Defendants contend that Mr. Kettle fails to state a claim because, in other cases, courts have found that exposing pretrial detainees or prisoners to unsanitary conditions for comparable (or longer) periods does not violate the constitution. Employee Defs.' Mem. 6 (citing *Smith*, 87 F.3d 265 and *Whitnack v. Douglas Cnty.*, 16 F.3d 954 (8th Cir. 1994)). This argument does not persuade the Court because the Employee Defendants isolate a single aspect of the unconstitutional-conditions claim articulated in the Complaint rather than properly focusing on the totality of the circumstances. *Stearns*, 957 F.3d at 909 (when evaluating detainee-punishment claims, courts are "concerned with the totality of circumstances of [the plaintiff's] confinement and not any particular condition in isolation," so "piecemeal analysis of the conditions . . . miss[es] the point").

Finally, at the hearing on the Employee Defendants' motion, defense counsel suggested that the Complaint was lacking because it failed to adequately allege what each of the corrections officer Defendants did over the course of the weekend. The Court disagrees. The Complaint explains that each of the guards at the Jail who is named as a Defendant in this case worked one or more day or night shifts between February 10th and February 12th. Further, the Complaint alleges that during those shifts, each of the Employee Defendants performed one or more purely perfunctory well-being checks and disregarded the conditions to which Mr. Kettle was exposed.

For these reasons, the Court finds that Mr. Kettle has stated a plausible due process claim against the Employee Defendants and their motion to dismiss Count II is denied.

## B. County Defendants

### Personal Involvement

The County Defendants raise several arguments in support of their motion to dismiss Count II. First, they argue that Mr. Kettle fails to state a § 1983 claim against Sheriff Fitzgibbons, Jail Administrator Carlson, and Assistant Jail Administrator Floden because he has not alleged that they were personally involved in the challenged conduct.

### Sheriff Fitzgibbons

With respect to the personal involvement of Sheriff Fitzgibbons, the Court agrees. The Complaint does not allege that the Sheriff was personally involved in any of the unconstitutional conduct that forms the basis of the due process claim in Count II. Specifically, there is no allegation that Sheriff Fitzgibbons personally failed to provide Mr. Kettle with food or water, deprived him of an opportunity to take a shower, denied him

28

access to exercise opportunities, or required him to stay in a filthy cell. Nor does Plaintiff allege that the Sheriff instructed any of the Employee Defendants or the Jail Administrators to take such actions. Consequently, the Court finds that the Complaint fails to sufficiently allege that Sheriff Fitzgibbons can be held liable on Count II based on any personal involvement in imposing the conditions of Mr. Kettle's confinement that amounted to punishment. However, because the Court finds that Plaintiff has alleged a sufficient supervisory liability claim against the Sheriff based on a failure-to-train, the Court denies the motion to dismiss Count II.

### Alleged Cover-Up by Jail Administrator Carlson

As to Jail Administrator Carlson, the Plaintiff contends that her personal involvement is sufficiently alleged in the Complaint because she attempted to engage in a cover-up of the mistreatment of Mr. Kettle. According to Plaintiff, Carlson knew about the Employee Defendants' mistreatment of Mr. Kettle, took no steps to investigate or report the abuse, and when she did finally make a report to I&E on February 20th, she both lied and attempted to forestall further outside investigation. Compl. ¶¶ 112–17. Plaintiff suggests that this alleged attempt at a cover-up is enough to find that she was personally involved in the mistreatment of Mr. Kettle that forms the basis of Count II under *S.L. ex rel. Lenderman v. St. Louis Metropolitan Police Department Board of Police Commissioners*, 725 F.3d 843 (8th Cir. 2013).

The *Lenderman* court found that a plaintiff adequately alleged a § 1983 conspiracy claim against a supervisory official who aided in the falsification of the plaintiff's arrest records with the object of depriving the plaintiff of access to the courts on her false arrest

claim. *Id.* at 853. However, *Lenderman* does not establish a broad proposition that any time a supervisory official allegedly attempts to conceal unconstitutional treatment by other officers, the plaintiff has stated a claim against that supervisory official under a theory that she was directly involved in the mistreatment. And Mr. Kettle has not alleged any comparable conspiracy among Carlson and the Employee Defendants or other County Defendants aimed at depriving Kettle of access to the courts. Nevertheless, the Court will not dismiss Count II as to Jail Administrator Carlson because, as discussed below, Plaintiff has adequately asserted a supervisory-liability claim against her under a failure-to-train theory.

### Administrators Carlson and Floden

Next, the County Defendants argue that the Complaint fails to allege the personal involvement of Assistant Jail Administrator Floden. The Court concludes that the Complaint adequately alleges Mr. Floden's personal involvement. Mr. Kettle plainly alleges that Assistant Administrator Floden directed the Employee Defendants to deprive Mr. Kettle of basic needs. Although Mr. Floden later documented that he instructed the corrections officers not to withhold a meal for punitive purposes, according to the Complaint, he instructed the Employee Defendants to do just that. At least one "Pass On Log" from the end of the February 11th day shift documents that Mr. Floden instructed the officers to withhold Mr. Kettle's evening meal. And Mr. Floden allegedly documented that he was responsible for preventing Mr. Kettle's access to exercise because he "doesn't deserve it" while instructing the officers to leave him in isolation. Compl. ¶¶ 85–97. For

these reasons, the Court finds that Plaintiff has adequately alleged Mr. Floden was personally involved in the deprivation of Mr. Kettle's constitutional rights.[10]

### Supervisory Liability and Failure to Train

The County Defendants argue that Mr. Kettle fails to state a claim against Sheriff Fitzgibbons or Jail Administrator Carson under a supervisory-liability theory. While government officials may not be held liable under § 1983 simply because they occupy a supervisory role, supervisors may be subject to liability "if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Perkins v. Hastings*, 915 F.3d 512, 524 (8th Cir. 2019) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001)). Such a claim requires a plaintiff to show that the defendant (1) was on notice of a pattern of unconstitutional acts by government employees; (2) "was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury to the plaintiff." *Id.* (quoting *Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018)) (cleaned up). A plaintiff must also show that the defendant was on notice that the training was inadequate and was likely to cause a violation of constitutional rights. *Id.*

Taking the allegations in the Complaint as true and viewing the inferences from the facts in the light most favorable to Mr. Kettle, the Court concludes that he has stated a plausible supervisory liability claim. The Complaint and the attached Conditional License

---

[10] Because the Court finds that Mr. Kettle states a claim against Assistant Jail Administrator Floden based on his direct personal involvement in the unconstitutional treatment between February 10–12, the Court does not further assess whether he could be held liable under a supervisory liability theory.

Order issued to the Jail by the DOC show that Sheriff Fitzgibbons and Administrator Carlson had prior notice that officers at the Jail were failing to conduct well-being checks for detainees in a manner that was adequate to serve their purpose, that the County's training regarding how to conduct those assessments was not adequate to ensure that Jail detainees' constitutional rights were honored, and that they failed to take sufficient action to correct the constitutionally inadequate well-being checks. Plaintiff further alleges facts indicating that the mistreatment of Mr. Kettle flowed from a series of over 100 flawed and perfunctory well-being checks over the course of the weekend. And indeed, a subsequent DOC investigation into the incidents at the heart of this case indicate that the Employee Defendants' conduct resulted from improper training. The Employee Defendants repeatedly noted that Mr. Kettle was doing "OK" even though he was demonstrating extraordinary distress, informing them that he was hungry and thirsty, and undergoing the kind of obvious mental-health extremis that would lead him to consume his own feces on two consecutive evenings. The DOC's investigation following a previous incident in which a detainee at the Jail died gave Sheriff Fitzgibbons and Jail Administrator Carlson sufficient notice that the inadequate training of the Jail's corrections officers around how to properly conduct well-being checks was likely to result in violations of detainees' rights. This is enough for Count II to survive the County Defendants' motion to dismiss Count II.

### Monell *and* City of Canton

The Court finds the same facts that support the Court's conclusion that Plaintiff has adequately stated a supervisory-liability claim against Sheriff Fitzgibbons and Administrator Carlson also support a claim against Otter Tail County under *Monell* and

*City of Canton*. The allegations show that the County had notice of the inadequacy of training prior to the events of this case and support an inference that the County failed to implement improved training. And the Complaint plausibly alleges that the County's failure to train its corrections officers caused Mr. Kettle's injury. Accordingly, the County Defendants' motion to dismiss is denied with respect to Count II and Count IV.

## IV.    Count III – Minnesota Constitution

Defendants seek dismissal of Count III of the Complaint in which Plaintiff asserts a claim for violation of his due process rights under Article I, § 7 of the Minnesota State Constitution. The Court dismisses this claim because there is no private right of action under the Minnesota Constitution. *Eggenberger v. West Albany Township*, 820 F.3d 938, 941 (8th Cir. 2016); *see also Daywitt v. Harpstead*, No. 24-cv-214 (JRT/SGE), 2025 WL 901598, at *4–5 (D. Minn. Mar. 25, 2025) (explaining that other than under the Minnesota Constitution's free-exercise clause, Minnesota courts have not recognized a private cause of action for state constitutional violations and that "the recognition of a private cause of action does not itself waive Eleventh Amendment sovereign immunity").

## V.    Counts V and VI – ADA and RA Claims

Mr. Kettle claims that the County Defendants violated the ADA and RA in two ways: (1) placing him in solitary confinement without conducting a mental health assessment or providing any reasonable accommodation for his known mental illness; and (2) punishing him because of his mental illness when he exhibited signs of a severe mental breakdown and was denied basic necessities. The County Defendants move to dismiss these claims.

"Title II of the ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Hall v. Higgins*, 77 F.4th 1171, 1180–81 (8th Cir. 2023) (quoting 42 U.S.C. § 12132). Similarly, "[t]he RA provides that no otherwise qualified individual with a disability shall be 'excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *Randolph v. Rodgers*, 170 F.3d 850, 857–58 (8th Cir. 1999) (quoting 29 U.S.C. § 794(a)). The two statutes are "similar in substance" and "cases interpreting either are applicable and interchangeable." *Id.* (quoting *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998)). They prohibit both discrimination because of disability and failure to accommodate disability. *Withers v. Johnson*, 763 F.3d 998, 1003 (8th Cir. 2014) ("Discrimination under the ADA . . . encompasses both disparate treatment because of a disability and failure to provide reasonable accommodations to a qualified individual's known disability.").

For a plaintiff to show discrimination in violation of the ADA and RA, he "must demonstrate that he is a qualified individual with a disability and that because of his disability, he was excluded from participation in or denied benefits of the Jail's services, programs, or activities." *Hall*, 77 F.4th at 1181; *see also Randolph*, 170 F.3d at 858 ("To state a prima facie claim under the ADA, a plaintiff must show 1) he is a person with a disability as defined by statute; 2) he is otherwise qualified for the benefit in question; and 3) he was excluded from the benefit due to discrimination based upon disability."). To

show that a defendant failed to provide reasonable accommodation, a plaintiff must show that an entity covered by the ADA and RA did not "make reasonable accommodation to the [plaintiff's] known physical or mental limitations . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004) (quoting 29 C.F.R. § 1630.9(a)); *see also Hall*, 77 F.4th at 1181 (explaining that a covered entity is required to provide a reasonable requested accommodation unless it shows that doing so would impose an undue burden).

In support of their motion to dismiss these claims, the County Defendants first assert that although Mr. Kettle has alleged he suffers from a mental illness, there are no facts alleged to suggest he has a diagnosis from a physician. County Defs.' Mem. 28. Defendants cite no law to suggest that Mr. Kettle was required to include such personal mental-health information in his complaint to adequately state an ADA or RA claim. The facts in his complaint sufficiently show that he is a qualified individual with a disability.

Second, the County Defendants argue that Mr. Kettle failed to allege facts showing that a qualified mental health professional determined that a less restrictive setting than solitary confinement would be appropriate. County Defs.' Mem. 28. But Mr. Kettle has alleged that the Jail did not have any qualified mental health professional assess Mr. Kettle ubefore he was placed in solitary confinement in 2024. Even the case on which the County Defendants rely to support their position recognizes that "[a] public entity cannot avoid its responsibility to make . . . reasonable modifications by not assessing the mental health

impacts of solitary confinement on mentally ill detainees." *C.P.X. through S.P.X. v. Garcia*, 450 F. Supp. 3d 854, 918 (S.D. Iowa 2020).

Finally, the County Defendants argue that because Mr. Kettle had a conviction for terroristic threats and had previously accrued disciplinary time, it could not have reasonably accommodated him based on "the heightened security concerns surrounding him." County Defs.' Mem. 28. This argument is unpersuasive. Whether accommodating Mr. Kettle would have imposed an undue hardship on the County Defendants is a question of fact and they have the burden to demonstrate this defense applies. To dismiss Mr. Kettle's accommodation claims on this argument would flip the proper Rule 12(b)(6) analysis on its head.

For these reasons, the County Defendants' motion to dismiss the ADA and RA claims in Counts V and VI is denied.

## VI.    Counts VII and VIII – State Law Claims

Defendants move to dismiss Mr. Kettle's state law tort claims for negligence and intentional infliction of emotional distress. This motion is also denied.

### A. Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress under Minnesota law, a plaintiff must allege the following elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Salier v. Walmart, Inc.*, 76 F.4th 796, 803 (8th Cir. 2023) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn. 1983)). For a defendant's conduct to rise to the level of "extreme and outrageous,"

it must "pass the boundaries of decency" and be "utterly intolerable to the civilized community." *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 865 (Minn. 2003). Conduct that merely involves "insults, indignities, threats, annoyances, petty oppressions, or other trivialities" does not suffice. *Id.*

In Count VIII, Mr. Kettle alleges that Defendants intentionally inflicted emotional distress when they placed him in segregation without assessing his serious mental illness and then withheld food, water, sanitary conditions, and daily necessities for nearly 52 hours. Compl. ¶ 239. He alleges that the "Defendant Officers routinely mocked, harassed, and humiliated [him] as he begged for food and water and displayed symptoms of his serious mental illnesses." *Id.* And he alleges that Jail Administrator Floden specifically directed the Employee Defendants to deny Mr. Kettle adequate nutrition. *Id.* Mr. Kettle claims that he suffered severe emotional distress as a result of Defendants' conduct. *Id.* ¶ 242.

The Employee Defendants argue that the Complaint fails to state a claim because leaving Mr. Kettle in an unsanitary cell for just over 48 hours and withholding meals and water from him are not sufficiently extreme or outrageous conduct, especially considering that Mr. Kettle "had the ability to control his access to food." Employee Defs.' Mem. 8. The County Defendants similarly argue that the Complaint fails to allege facts showing extreme or outrageous conduct. County Defs. Mem. 30–31. The Court disagrees. As already explained, it is a distortion of the allegations in the Complaint to suggest that Mr. Kettle himself controlled his own access to food and water. And, quite simply, Defendants have failed to point to any case law establishing that the egregious treatment alleged in the

Complaint could not form the basis of an intentional infliction of emotional distress claim under Minnesota law.

Next, the County Defendants argue that this claim should be dismissed because Mr. Kettle does not allege any specific acts by Sheriff Fitzgibbons or Administrators Carlson and Floden and Otter Tail County should not be held vicariously liable. With respect to Floden, the Court disagrees. The Complaint specifically alleges that he directed the Employee Defendants, at a minimum, to withhold food and the opportunity to exercise. Compl. ¶¶ 95–97. In addition, the Court finds that the County can be held vicariously liable for the torts of the Employee Defendants, and the County Defendants do not cite any case law supporting dismissal of such a vicarious liability claim on similar facts.

However, the Court agrees with the County Defendants that Mr. Kettle has not alleged that Sheriff Fitzgibbons or Administrator Carlson were personally responsible or even present for the conduct that forms the basis of this claim. Instead, the Complaint indicates that Fitzgibbons and Carlson learned about the tortious conduct of others after the fact. Accordingly, the Court agrees that the Complaint fails to state a claim for intentional infliction of emotional distress against Sheriff Fitzgibbons and Administrator Carlson.

## B. Negligence

"To prevail in a negligence claim under Minnesota law, 'a plaintiff must prove (1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the breach of the duty of care was a proximate cause of the injury.'" *DeLuna v. Mower Cnty.*,

936 F.3d 711, 716 (8th Cir. 2019) (quoting *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011)).

Mr. Kettle's negligence claims allege that Defendants violated their duties to him when they placed him "in segregation, without any assessment of his serious mental illness, and then withheld food, water, sanitary conditions, and daily necessities for nearly 52 hours." Compl. ¶ 236. Defendants raise several arguments why these negligence claims should be dismissed, though none of these arguments convinces the Court that dismissal is required.

For example, the Employee Defendants argue that the negligence claim should be dismissed because they "fulfilled their duty of checking on Kettle throughout the weekend," and they again contend that "Kettle, himself, was in control of access to food." Employee Defs.' Mem. 9. For reasons already discussed, the Court finds this argument unpersuasive.

Defendants' remaining arguments include the following:

- The County Defendants argue that Mr. Kettle fails to allege that Fitzgibbons and Carlson engaged in any conduct that caused "a direct injury as a result of a breach of a duty to Kettle." County Defs.' Mem. 32.

- The County Defendants contend that Floden only allegedly directed some of the Employee Defendants to "withhold privileges" from Mr. Kettle and it was "not foreseeable officers would have withheld meals as punishment when Kettle admits the policy manual specifically prohibits it." *Id.* at 33.

- The County Defendants argue that Floden is entitled to official immunity because his alleged conduct involved the performance of discretionary duties, implicating the security and management of the jail, and he did not act maliciously or willfully. *Id.* at 33–36. Similarly, the Employee Defendants argue that they are entitled to official immunity for their alleged conduct because they

made only discretionary decisions and acted without malice. Employee Defs.'
Mem. 9–11.

- The County Defendants assert that they are entitled to statutory immunity
because the conduct they allegedly engaged in constituted policy-level decisions
as opposed to the day-to-day operations of the jail. County Defs.' Mem. 36–38.

- The County Defendants argue that Plaintiff has attempted to amend his
complaint through his response to the motion to dismiss. County Defs.' Reply
11, 12.

The Court has carefully reviewed and considered these arguments along with the
Complaint and Plaintiff's responses to each issue they present. In sum, the Court finds that
the Complaint contains a short and plain statement showing that Mr. Kettle is entitled to
relief based on the law of negligence, Fed. R. Civ. P. 8(a)(2), and the pleading adequately
provides notice of the claims to Defendants. Given the facts asserted in the Complaint, the
Court cannot definitively say that Mr. Kettle's pleading fails to allege facts that state a
plausible claim. And in light of those allegations, the Court finds that the applicability of
any immunity should be resolved, if necessary, based on a more complete record.
Discovery will illuminate questions about the nature of the conduct involved (ministerial
v. discretionary; policy-level v. day-to-day operations) and inform the degree to which any
Defendant may have acted with the requisite state of mind (willfully or maliciously), both
of which the Court finds to present questions of fact based on the Plaintiff's allegations.
Accordingly, the Court will not dismiss Plaintiff's negligence claims pursuant to Rule
12(b)(6) based on the arguments summarized above.

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT** Defendants'

motions to dismiss (Dkt. 37, Dkt. 42) are **granted in part and denied in part** as discussed

in this Order.

1. With respect to Count I:

   a. The motions to dismiss are **granted** in part and Count I of the Complaint is **dismissed** against Defendants Fitzgibbons, Carlson, Floden, Anderson, Larson, Boeckers, Evavold-Toso, Hastings, Johnson, Lehmann, Olson, Parker, Rasmusson and Rotering in their individual capacities based on qualified immunity; and

   b. The motion to dismiss Count I of the Complaint is **denied** with respect to Defendant Otter Tail County.

2. The motions to dismiss Count II are **denied**.

3. The motions to dismiss Count III of the Complaint are **granted** and Count III is **dismissed**.

4. The motion to dismiss Count IV of the Complaint is **denied**.

5. The motion to dismiss Counts V and VI of the Complaint is **denied**.

6. The motions to dismiss Counts VII and VIII are **denied** except that the intentional infliction of emotional distress claim in Count VII is **dismissed** with respect to Defendants Fitzgibbons and Carlson.

Date: August 15, 2025                    *s/Katherine Menendez*
                                         Katherine Menendez
                                         United States District Judge